United States District Court
Middle District of Florida
Jacksonville Division

**JQ ADAMS & SONS, INC.,**

    *Plaintiff,*

V.                                              **NO. 3:21-cv-492-TJC-PDB**

**SCOTTSDALE INSURANCE COMPANY,**

    *Defendant.*

## Order

Scottsdale Insurance Company moves for sanctions against JQ Adams & Sons, D19, to preclude JQ from using testimony of its expert, D23, and, to the extent JQ is precluded from using that testimony, for summary judgment, D24. JQ opposes the motions. D22, D25, D26.

### I.    Background

JQ is a business with property on Edgewood Avenue in Jacksonville, Florida. JQ has property insurance through Scottsdale.

According to JQ, on March 31, 2020, a windstorm swept through the area and damaged the property. JQ thus submitted an insurance claim. According to Scottsdale, the damages are from wear, tear, deterioration, and inadequate repairs. Scottsdale thus denied the claim. JQ sues to resolve the dispute.

The Court entered a scheduling order establishing October 27, 2021, as the deadline for JQ to disclose expert reports; January 14, 2022, as the deadline for the parties to complete discovery (later extended to March 25, 2022, at the parties' request); and April 1, 2022, as the deadline for the parties to file any dispositive or *Daubert* motion.

## II.   Motion for Sanctions

### A.   *Factual Bases for Motion*

Scottsdale bases its motion for sanctions on circumstances surrounding three events: the deposition of public adjuster Kaleb Mock, who knew little about the dispute; the second deposition of David Corcoran, which was supposed to be of his son also named David Corcoran; and the substitution of JQ's expert Anibal Flores with Patrick Huff without a new report.

### 1.   *Deposition of Mock*

In an answer to an interrogatory, JQ identified "Noble Public Adjusting Group" as an entity that had visited the property to either assess the cause of damage or provide a repair or replacement estimate. D19-2 at 4 ¶ 5.

Legal assistants emailed each other about a deposition of the "PA." D19-5. An assistant for Scottsdale's counsel asked an assistant for JQ's counsel whether JQ would be "producing" the PA or whether Scottsdale would have to subpoena the PA and for "dates for the PA and their contact information." D19-5 at 11, 12. The assistant for JQ's counsel obtained information from Noble Public Adjusting Group and responded, "PA: Kaleb Mock has confirmed 11/23 at 10am. Please be advised that a subpoena will be needed to the following

2

address: Noble Public Adjusting Group, 107 Amar Place #103 Panama City Beach, FL 32413 USA." D19-5 at 5.

Scottsdale thus deposed Mock. The deposition occurred virtually and lasted thirteen minutes. Mock testified he is a public adjuster for Noble Public Adjusting Group and had worked on JQ's claim but only as an "apprentice" and "[c]ustomer service representative" relaying messages from the insured to the insurer. D19-6 at 5–6. He testified he may have examined reports of the weather on the day in question but could not remember. He testified he had not inspected the property, had not prepared the repair estimate, and had no opinion about the estimate, damages, date of loss, cause of loss, or cost of repairs.

Immediately after the deposition, the assistant for Scottsdale's counsel emailed the assistant for JQ's counsel, "Please advise and confirm who was the actual public adjuster for this claim, with knowledge of damages and repair costs to the insured property[.] We want the deposition of the person who inspected the property and created the repair estimate." D19-5 at 3. The assistant for JQ's counsel responded, "I have reached out to Noble Public Adjusting to get that information for you," and later, "Noble has advised that the 'Desk' PA at Noble, Ariel Morales ([s]till with Noble), retained the following third party to perform inspection and generate estimate: Miami Estimates … Joel Rosario, *Property Damage Estimator*—(786) 817-1175." D19-5 at 1, 2 (emphasis omitted).

2. *Deposition of Corcoran*

Scottsdale deposed David Corcoran, JQ's corporate representative. *See* D20-1 (transcript). He testified he knew of no leaks or interior water damage

3

to the property before the alleged windstorm. He testified the only roof repairs of which he was aware occurred five to six years before his deposition.

Scottsdale deposed Clarence Hester, who had worked for JQ from 2017 to 2020. *See* D19-7 (transcript). He testified that after Hurricane Irma (in September 2017), "[t]he roof was leaking, it flooded at times, the floor flooded, the building flooded completely." D19-7 at 6. He testified Corcoran's son "used to go up on the roof," but he did not know whether the son went for repairs. D19-7 at 7, 10. He testified, "I know there is some stuff that they tried to do, like self-repairs" after Hurricane Irma. D19-7 at 10. Asked whether the leaks worsened after the alleged windstorm, he testified, "I don't know if they got worse. They were already bad[.] I don't know how much worse they could get." D19-7 at 12.

Scottsdale's counsel thereafter emailed JQ's counsel, "I … would like the deposition of David Corcoran, Jr. in this case, in light of Mr. Hester's testimony[.]" D19-10 at 6.

The assistant for Scottsdale's counsel emailed the assistant for JQ's counsel proposed days for "the deposition of **David Corcoran, Jr.**" D19-10 at 4. The assistant for JQ's counsel responded, "David Corcoran is available on February 18th at 2 pm." D19-10 at 3. The assistant for Scottsdale's counsel replied, "We are confirmed for Mr. Corcoran on February 18, 2022 at 2:00 p.m. … We will send [n]otices shortly." D19-10 at 1. Scottsdale's counsel served on JQ's counsel a "Notice of Taking Deposition[]" of "David Corcoran." D22-1. According to JQ, the notice "was sent" (by whom is unclear) to the elder Corcoran's residence. D22 at 5.

4

The elder Corcoran appeared at the deposition. *See* D19-11 (transcript). The deposition occurred virtually and lasted one minute. Scottsdale's counsel asked, "Mr. Corcoran, are you David Corcoran, Junior?" D19-11 at 4. The elder Corcoran answered, "There is no such person as David Corcoran, Junior," explaining his son has a different middle name. D19-11 at 4–5. Scottsdale's counsel confirmed the elder Corcoran had been deposed and stated, "Today's deposition was to be of your son." D19-11 at 4. The elder Corcoran responded, "Well, that is a little difficult. My son is in the Marine Corps boot camp." D19-11 at 4. Scottsdale's counsel stated, "[W]e noticed the deposition of your son to take place today. We coordinated that deposition with [JQ's] counsel." D19-11 at 5. The elder Corcoran responded, "Well, I saw David Corcoran. I didn't see the Edward part." D19-11 at 5.

In a follow-up email, JQ's counsel confirmed the younger Corcoran is serving in the Marine Corps and attending bootcamp and thus unavailable "by all accounts." D19-12; *see also* D22-2 ("Status Report Pursuant to Servicemembers Civil Relief Act" showing the son began serving in the Marine Corps on December 13, 2021, and, as of March 9, 2022, continues to serve in active duty).

3.   *Deposition of Huff*

In September 2021, JQ served on Scottsdale an "Expert Witness Disclosure" identifying Anibal Flores, P.E., with Air Quality Assessors of Florida ("AQA") as an expert on causation and damages. D19-14 at 1–2. JQ stated a report and photographs prepared by Flores had been or would be produced to Scottsdale's counsel and Flores's curriculum vitae and "deposition fee schedule" had been requested and would be produced. D19-14 at 2.

The cover of the report includes the title "Forensic Engineering Report" and the statement "Prepared by: Air Quality Assessors of Florida." D23-4 at 1. The report was digitally signed by Flores on February 16, 2021.

In a section titled "Background," the author explains:

> A field walk-thru was performed at 284 S Edgewood Ave … on July 15, 2020. The purpose of the field walk-thru was to evaluate damage to the commercial structure attributed to the effects of a storm event that occurred on March 31, 2020. The field visit included visual walk-thru of readily observable surfaces and collection of digital evidence.

D23-4 at 2. In a section titled "Storm and Meteorological Data," the author describes weather activity on the day in question based on "Interactive Hail Maps" and "NOAA's National Centers for Environmental Information" databases. D23-4 at 2–3. The author opines, "Statements made by the insured and a review of historic NOAA weather data support the opinion that the storm event that occurred on March 31, 2020 is the proximate storm event that caused the damages documented during the field walk-thru[.]" D23-4 at 2–3. In a section titled "Field Walk-thru of Damage," the author describes damages observed and determined from a "test of brittleness." D23-4 at 3. In a section titled "Discussion and Analysis," the author describes damages and provides opinions about their causes and repairability. D23-4 at 4–9. In a section titled "Disclosure of Limitation," the author adds disclaimers. D23-4 at 12–13.

Included with the report are 137 color photographs of the building, including close-up images of parts of the roof taken during the "field walk-thru." D23-4 at 14–83. Also included with the report are exhibits about the weather data and weather events, including, for the day in question, reports of a tree down and a tornado and where those events occurred in relation to the property. D23-4 at 85–91.

On December 27, 2021, the assistant for JQ's counsel emailed Scottsdale's counsel, "Regarding [Flores's deposition] … scheduled for 01/10/22 …, we were just advised that he is no longer employed by AQA, and they will not be able to produce him. AQA has advised that they can produce Patrick D. Huff, P.E., their Director of Engineering who oversees the completion of each of their engineering reports." D22-3 at 1–2. Scottsdale's counsel responded, "Are you withdrawing Flores as your expert[] and seeking to substitute Huff? If so, please serve appropriate Notice(s), etc. I'll proceed with Huff if that's who Plaintiff intends to call at trial as its expert." D22-3 at 1.

On January 3, 2022, JQ served on Scottsdale an "Amended Expert Witness Disclosure" identifying Huff as an expert on causation and damages. D19-15 at 1–2. Using the same language in its disclosure for Flores, JQ stated a report and photographs prepared by Huff had been or would be produced to Scottsdale's counsel and Huff's curriculum vitae and "deposition fee schedule" had been requested and would be produced. D19-14 at 2.

For reasons unclear, the next day, on January 4, 2022, Scottsdale directed a process server to serve Flores with a subpoena to testify. D19-16 at 5. On January 7 and 10, the process server emailed the assistant for Scottsdale's counsel to convey that service attempts on January 6 and 10 had been unsuccessful. D19-16 at 1, 3. The process server returned the subpoena unserved on January 11, explaining, "Multiple attempts, people inside, no response at door. Evading. Recalled by client." D19-16 at 5.

Meanwhile, on January 10, Scottsdale proceeded with Huff's deposition. *See* D19-17 (deposition). The deposition occurred virtually and lasted nearly three and a half hours.

Huff testified about his credentials to serve as an expert on causation and damages, including his occupation (structural engineer), job title (engineering manager), education (bachelor of science in civil engineering), engineering experience (32 years), engineering licenses (Florida, California, Louisiana, Mississippi; all active, no suspensions), certifications (maintenance-of-traffic and bridge-load-rating), job history (including having been in charge of facilities maintenance and repairs at the Kennedy Space Center), years he has inspected property for storm damage (17 years), and training on identifying storm damage to property (Haag training on general damages to asphalt shingles and tile roofs).

Huff testified he received the file a week earlier and explained the circumstances of his substitution for Flores as the expert for this case. He explained AQA had terminated Flores the week earlier because Flores did not like the company culture or the way the company prepared reports. He testified Flores is a civil engineer. He did not know other details about Flores, like his work history, training, and qualifications. He testified Flores had been scheduled to testify at ten depositions. He testified he did not know whether Flores was trying to evade service of process.

Huff testified he thinks AQA charged $3,000 for its services. He explained AQA (not JQ or its counsel) pays him.

Huff testified about each item in AQA's file for JQ, including photographs, an engineering log, and an engineering report. Scottsdale's counsel asked if any photographs depicted abrasion, billowing, detached seams, shingle-sealant failure, impact from windborne debris, lifted shingles, creased shingles, popped nails, detached sealant strip, ponding, roof openings where water could have entered, damage to elevations, and windborne-debris

8

strikes to flashing. Huff answered yes, identified the photographs depicting each type of damage, and explained his reasoning when asked to do so. Scottsdale's counsel asked if any photographs depicted granular loss, debris on the roof, or shingles missing from the roof. Huff answered no.

Huff agreed that if wind is strong enough to cause billowing, detached seams, and uplift on a modified bitumen roof, the wind would be strong enough to blow shingles off. He acknowledged no section of the membrane roof had blown off. He disagreed that the shingled portion of the roof would be more vulnerable than the flat portion of the roof and explained his reasoning.

Huff testified the opinions in the report require specialized knowledge or training and Flores had used industry methodology in forming his (Flores's) opinions. Huff opined the opinions in the report are correct and explained his reasoning when asked to do so. He explained words or statements in the report, including a statement that the report was reviewed in accordance with AQA's standard practice.

Huff testified the weather report gave him reason to believe there was tornado activity at the property. He opined the damages appeared fresh and explained his reasoning. He opined the damages are not the result of Hurricane Irma or multiple storms and explained his reasoning while acknowledging aerial photographs predating the alleged windstorm showed ponding on the roof. He acknowledged some photographs showed repairs to the roof, testified the repairs did not affect his opinions, and explained his reasoning. He testified he had no reason to believe either construction defects or incomplete tab-sealing contributed to the damage. He opined wind caused a wall to crack and explained his reasoning while acknowledging that settlement can also cause cracking.

9

Huff testified he was providing his opinions "to a reasonable degree of professional probability." D19-17 at 73. He acknowledged his opinions are not based on firsthand observations, explaining he was relying on the totality of the information gathered during the investigation. He acknowledged Flores had signed the report and he (Huff) had only "glanced through" it before the deposition. D19-17 at 24, 25. Huff acknowledged some photographs remain with Flores and are not with AQA.

Huff did not know some details of Flores's inspection (how long the inspection lasted; whether anyone accompanied Flores; whether Flores inspected every structure on the property; whether Flores looked for, observed, or photographed other damage; whether Flores observed windblown debris on the ground; and whether Flores removed any shingles from the roof). He did not know some details of the claim (who reported the damage and when; who assigned March 31, 2020, as the day the property was damaged; and who had hired AQA). He did not know some details of the property (the age of the building; the age of the roof; when the roof had been repaired; and whether any shingles were missing from the roof). He did not know some details of the report (how it differed from a report dated earlier; the meaning of "CAPE"; the meaning of "existing functional obsolescence will be evaluated by the party in competence according to actual construction costs for all deficiencies and demolition costs for all excess"; and whether Flores determined the storm NOAA reported had been at the property). He did not know some details of weather events on the day in question (how close weather events identified in the report were to the property; whether JQ suffered a power outage; and the highest sustained winds at the property). And he did not know some details of other subjects (whether the alleged windstorm damaged any trees, vehicles, or fences on the property; when roof shingles become brittle in Jacksonville; the

number of weather stations in Jacksonville; and the closest weather station to the property).

## B. *Scottsdale's Request and JQ's Response*

Based on these three sets of circumstances, Scottsdale asks the Court to use authority in 28 U.S.C. § 1927, inherent authority, and authority in Federal Rules of Civil Procedure 16(f) and 37(c) to:

> [impose] any and/or all of the following, as well as any further relief that the Court may deem appropriate: (i) an award of SCOTTSDALE's costs incurred in connection with undersigned counsel's preparation for, and attendance at, the November 23, 2021 deposition of Kaleb Mock (incorrectly identified by Plaintiff and/or its counsel as the Plaintiff's Public Adjuster), as well an award of associated court reporter fees; (ii) an award of SCOTTSDALE's costs incurred in connection with undersigned counsel's preparation for, and attendance at, the February 18, 2022 coordinated deposition of (the junior) David Corcoran, at which the wrong witness appeared, as well as an award of associated court reporter fees; (iii) an order that it is deemed established in this case that Plaintiff made repairs to the roof of its Property following Hurricane Irma and in connection with damages to the roof, and ensuing interior water damages, caused by Hurricane Irma on September 10, 2017; (iv) a finding and/or presumption that the junior David Corcoran's deposition testimony would have been adverse to Plaintiff; (v) a finding and/or presumption that the junior David Corcoran's deposition testimony would have disproved Plaintiff's theory of the case; (vi) an order that the junior David Corcoran is precluded from offering testimony, or other evidence, at the trial of this case; (vii) a finding that Plaintiff, through its Corporate Representative David Corcoran, made material misrepresentations in this case relative to prior (pre-existing the alleged date of loss in this case) damages to the subject Property (including damages to the roof, and interior water damages as a result of leaks), and made material misrepresentations in this case relative to prior repairs to the subject Property; (viii) an order that Plaintiff is precluded from presenting, introducing, or referencing in this case any testimony, or other evidence (including Forensic Engineering Reports, photographs, and other file materials) of Anibal Flores, P.E.; (ix) an order precluding Plaintiff from presenting, introducing, or referencing in this case any testimony or other evidence of Patrick Huff, P.E.; and, (x) an order dismissing Plaintiff's suit with prejudice.

11

D19 at 16–17.

JQ argues Scottsdale's request for sanctions under § 1927 is "somewhat ironic" considering that the purpose of the statute is to deter frivolous litigation, deter abusive practice by lawyers, and ensure the person who causes unnecessary expenses pays them. D22 at 1. According to JQ, the "17-page, hyperbolic, and misleading [m]otion is itself a prime example of frivolous and unnecessary motion practice." D22 at 1.

*C.     Law*

Under § 1927, "Any attorney or other person admitted to conduct cases in any court of the United States … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

Unreasonable and vexatious conduct is "tantamount to bad faith." *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1282 (11th Cir. 2010). The standard is objective, comparing the lawyer's conduct to how a reasonable lawyer would have acted. *Id.* at 1282, 1284. "The statute imposes a high standard that requires the moving party to show" the lawyer "engaged in behavior that grossly deviates from reasonable conduct." *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (internal quotation marks omitted). The statute is penal and thus strictly construed. *Norelus*, 628 F.3d at 1281.

Besides § 1927, a court also has inherent authority to sanction a lawyer or a party for acting "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 45–46 (1991). The

standard is subjective. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223–24 (11th Cir. 2017). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. "When considering sanctions under the court's inherent power, the threshold of bad faith conduct is at least as high as the threshold of bad faith conduct for sanctions under § 1927." *Peer v. Lewis*, 606 F.3d 1306, 1316 (11th Cir. 2010) (internal quotation marks omitted).

A court also may impose sanctions under the Federal Rules of Civil Procedure, including under Rules 16(f) and 37(c). Rule 16(f) provides, "On motion or on its own, the court may issue any just orders … if a party or its attorney … fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). Rule 37 provides, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions[.]" *Id.*

Rule 26(a) and (e)—the rules referenced in Rule 37(c)(1)—are the disclosure and supplemental-disclosure rules. The disclosure rules are designed to provide the opposing party with a reasonable opportunity to prepare effective cross-examination and decide whether to arrange the party's own expert testimony. *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1361–62 (11th Cir. 2008). Among other obligations, a party must

13

disclose to the opposing party the identity of any expert it may use at trial to present evidence. Fed. R. Civ. P. 26(a)(2)(A). If an expert "is one retained or specially employed to provide expert testimony in the case," the party must include with the disclosure a report "prepared and signed by the witness" containing "a complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness in forming them," "any exhibits that will be used to summarize or support them," "the witness's qualifications, including a list of all publications authored in the previous 10 years," "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition," and "a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(i)–(vi).

Expert disclosures must be made at the "times and in the sequence that the court orders" or, if not ordered, "at least 90 days before the date set for trial or for the case to be ready for trial[.]" Fed. R. Civ. P. 26(a)(2)(D). When "the court has entered a scheduling order, the court's deadlines control." *Knight ex rel. Kerr v. Mia.-Dade Cnty.*, 856 F.3d 795, 812 (11th Cir. 2017).

A party that has disclosed an expert "must supplement or correct [the] disclosure … in a timely manner if the party learns that in some material respect the disclosure … is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing" or "as ordered by the court." Fed. R. Civ. P. 26(e)(1)(A)–(B). To be "timely," supplementation "should be made at appropriate intervals during the discovery period." Fed. R. Civ. P. 26(e) advisory committee's note to 1993 amendment.

*D.    Analysis*

Scottsdale fails to satisfy its burden of showing sanctions are warranted.

Regarding the depositions of Mock and the elder Corcoran, Scottsdale points to no bad faith or vexatious, wanton, or oppressive conduct, whether viewed objectively or subjectively. Moreover, Scottsdale ignores its own counsel's failings contributing to the mishaps. Scottsdale's counsel relied heavily on her assistant to plan the depositions. Although the PA with the most knowledge of the claim was implied, the assistant failed to detail whom from Noble Public Adjusting Group Scottsdale wanted to depose beyond "PA" until after Mock's deposition. And Scottsdale's counsel drafted a notice rather than a subpoena to non-party "David Corcoran" without clarifying in the notice which of the two men with the same first and last names should appear.

Considering that Scottsdale points to no evidence of bad faith, vexatiousness, wantonness, or oppressiveness; the failings of Scottsdale's own counsel; and that the depositions involved non-parties, were conducted virtually, and together lasted only fourteen minutes, the request for sanctions lacks merit.

Regarding the substitution of Huff for Flores, Scottsdale again points to no bad faith, vexatiousness, wantonness, or oppressiveness, whether viewed objectively or subjectively, and Scottsdale fails to convincingly argue sanctions are warranted under either Rule 16(f) or 37(c). Scottsdale's counsel invited any failure, saying she would "proceed with Huff if that's who [JQ] intends to call at trial as its expert" and vaguely requesting service of "appropriate 'Notice(s)', etc." D22-3 at 1. She proceeded to depose Huff and did so vigorously, extensively, and effectively, questioning him about his opinions mirroring the

15

opinions in the report Scottsdale had possessed for months. The purpose of the expert disclosure rule was served.

Thus, denying Scottsdale's motion for sanctions, D19, is warranted.

If JQ has not already done so, JQ must expeditiously supplement discovery on how much AQA has been paid to date.

### III. Motion to Preclude JQ from Using Huff's Testimony

Based on the circumstances involving Huff, Scottsdale asks the Court to apply Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to preclude JQ from using Huff's testimony. D23. According to Scottsdale, Huff is unqualified to testify competently about causation and damages, his opinions are based on insufficient facts or data, his opinions are not the product of reliable methods or principles, and his testimony will be unhelpful to the trier of fact. D22 at 23.

Rule 702 provides, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

In *Daubert,* the Supreme Court stated the requirements for the admissibility of expert testimony under Rule 702. 509 U.S. at 589–94. "As explained by the Supreme Court, the purpose of the expert admissibility rules

16

is to enlist the federal courts as gatekeepers tasked with screening out speculative and unreliable expert testimony." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (internal quotation marks omitted).

To determine admissibility of expert testimony, a court asks whether "(1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 850–51. "[W]hile there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *Id.* at 851 (internal quotation marks and quoted authority omitted).

"[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. The expert may rely on reports or information of other experts in forming his own opinions, but he may not become the other expert's "spokesman." *In re James Wilson Assocs.*, 965 F.2d 160, 172–73 (7th Cir. 1992).

After *Daubert*, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. "[C]ourts must remain chary not to improperly use the admissibility criteria to supplant a plaintiff's right to a jury trial[.]" *Moore*, 995 F.3d at 850. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

17

appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Under these standards, Scottsdale's arguments fail.

Huff is qualified to opine about causation and damages in this case. He is a licensed structural engineer with 32 years' experience, once headed facilities maintenance and repairs at NASA's Kennedy Space Center, has 17 years' experience inspecting property for storm damage, and has Haag training on general damages to asphalt shingles and tile roofs.

Huff's opinions are sufficiently reliable. He testified he formed his opinions based on his consideration of the photographs and information in the report. He provided his reasoning when asked to do so and referenced photographs to explain his opinions; he did not simply regurgitate Flores's opinions. *See, e.g.*, D19-17 at 44–45 (explaining his opinion that wind strong enough to cause billowing, detached seams, and uplift on a modified bitumen roof would also be strong enough to blow shingles off), 45 (explaining his opinion that the shingled portion of the roof would not be more vulnerable than the flat portion of the roof), 54 (explaining his opinion that wind caused a wall to crack), 58–65 (explaining his opinion that the March 31, 2020, weather event caused the damages).

By applying his specialized expertise in structural engineering and inspecting property for storm damage, Huff can help the trier of fact decide whether a windstorm on March 31, 2020, caused the claimed damages. *Cf. Woodbury Lodging LLC v. Integrity Mut. Ins. Co.*, No. 20-CV-1015 (SRN/DTS), 2022 WL 1004602, at *6 (D. Minn. Apr. 4, 2022) ("[I]t is permissible for an engineer to form an opinion relating to hail damage based on a meteorologist

18

report and photographs of the roof."); *Refrigeration Supplies, Inc. v. Acadia Ins. Co.*, 507 F. Supp. 3d 1096, 1104 (E.D. Mo. 2020) (rejecting *Daubert* challenge to testimony about hail damage to a roof by an engineer who had based his opinions on a meteorological report, photographs, and fractures in the roof membrane); *TBC-JP-LR, JV v. Allied Prop. & Cas. Ins. Co.*, No. 4:17-CV-131-Y, 2018 WL 10562785, at *4 (N.D. Tex. Sept. 28, 2018) (rejecting *Daubert* challenge to testimony about weather damage to roofs by a structural engineer who based his opinions on experience and reviewing notes by a registered roofing observer, photographs of the roofs, NOAA weather data for the period in question, and industry resource materials). Scottsdale's challenges to Huff's lack of knowledge about certain subjects concern the weight of his testimony, not its admissibility, and are more aptly addressed through cross-examination.

Thus, denying Scottsdale's motion to preclude JQ from using Huff's testimony, D23, is warranted.

## IV.  Motion for Summary Judgment

Scottsdale asks the Court to enter summary judgment in its favor, contending that JQ cannot prove the alleged windstorm caused the damages without expert testimony. Because Scottsdale's other motions fail, this motion, D24, fails.

## V.  Conclusion

The Court **denies** Scottsdale's motions for sanctions, D19, to preclude JQ from using Huff's testimony, D23, and for summary judgment, D24.

The trial is scheduled to occur during the September 2022 trial term. D12. If the parties want the trial to start on a certain day any month this year,

they may jointly consent to magistrate-judge jurisdiction. Magistrate judges have more flexibility than district judges in calendaring civil trials because of the absence of felony criminal trials on magistrate judges' calendars. The district judges here have particularly busy trial calendars in 2022. To consent, the parties should review Federal Rule of Civil Procedure 73 and jointly complete and file AO Form 85, "Notice, Consent, and Reference of a Civil Action to a Magistrate Judge." The parties may withhold consent without adverse substantive consequences.

**Ordered** in Jacksonville, Florida, on July 8, 2022.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*